Filed 11/16/23 P. v. Martinez CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>TIBURCIO EMETERIO MARTINEZ,<br><br>  Defendant and Appellant. | 2d Crim. No. B322582<br>(Super. Ct. No. 2020027482)<br>(Ventura County) |

Tiburcio Emeterio Martinez appeals from the judgment after a jury convicted him of two counts of lewd acts on a child under age 14 (Pen. Code,[1] § 288, subd. (a); counts 1 and 2), one count of continuous sexual abuse of a child (§ 288.5, subd. (a); count 3), one count of incest (§ 285; count 4), two counts of unlawful sexual intercourse with a child (§ 261.5, subd. (d); counts 5 and 9), two counts of sexual penetration of a child with a foreign object (§ 289, subd. (i); counts 6 and 10), one count of oral

---

[1] Unlabeled statutory references are to the Penal Code.

copulation of a child (§ 287, subd. (b)(2); count 7), and two counts of lewd acts on a child under 16 (§ 288, subd. (c)(1); counts 8 and 12).  The trial court sentenced him to 26 years in state prison: 12 years on count 3; six years on count 1; two years on count 2; one year each on counts 5 and 9; and eight months each on counts 4, 6, 7, 8, 10, and 12.

Martinez contends the judgment should be reversed because: (1) the court admitted into evidence statements obtained in violation of the privilege against self-incrimination, and (2) the court admitted evidence of child sexual abuse accommodation syndrome (CSAAS) that was unreliable and unduly prejudicial. He also contends: (3) his sentence on count 4 should be stayed pursuant to section 654.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

D.M. lived with Martinez, his father, when he was between 10 and 14 years old.[2]  D.M.'s sister, A.M., lived with them for part of that time.

Shortly before D.M. turned 13, Martinez began to "graze" him with his penis while the two played or lay in bed.  He did this at least three times.  After D.M.'s 13th birthday, Martinez touched D.M.'s vagina with his fingers and asked him "if it felt good."  D.M. said nothing.  Martinez later told him that he "couldn't stop" and asked D.M. for forgiveness.

On another occasion when he was 13, D.M. was watching a movie with his father and sister.  After A.M. fell asleep, Martinez took D.M.'s hand and put it on his erect penis.  Martinez then inserted his penis into D.M.'s vagina.  Martinez repeated this abuse multiple times, increasing in frequency from about once

_____

[2] D.M. was assigned female at birth.  He identifies as male and uses masculine pronouns.

2

every three days to almost daily.  He also put his fingers in D.M.'s vagina and touched D.M.'s breasts.

Martinez continued to put his penis in D.M.'s vagina after D.M. turned 14.  The frequency of Martinez's abuse varied from daily to "just on the weekends" to "three times a week" to "often."  Martinez also continued to put his fingers in D.M.'s vagina and touch D.M.'s breasts.  He began to orally copulate D.M.'s vagina and forced D.M. to orally copulate him.

Martinez apologized for his abuse, telling D.M. "that it wasn't right, that he would have to pay, [and] that it would have to stop, but that he couldn't, that it felt good."  He said that if D.M. spoke to anyone about what was going on that he would be arrested and get deported.  D.M. and A.M. could also be sent to a foster home.

The last time Martinez put his penis in D.M.'s vagina was on or around September 20, 2020.  On September 23, Detectives Jesus Nunez and Alyse Quiroz went to Martinez's house and asked to speak to D.M. after a friend of his told police of Martinez's abuse.  Martinez said the detectives could take D.M. to the station and that he would pick him up later.

Detective Quiroz interviewed D.M. at the police station.  Initially, D.M. told her that everything was fine because he was afraid of being separated from A.M.  He then told the detective about Martinez's abuse.

## DISCUSSION

*Martinez's statements to Detective Nunez and D.M.*

Martinez first contends the judgment should be reversed because admitting his statements to Detective Nunez and D.M. into evidence violated his privilege against self-incrimination.  We disagree.

3

### 1. *Background*

When Martinez arrived at the police station, Detective Nunez took him to an interview room.  He closed the door for privacy, and told Martinez that he was not obligated to answer any of his questions, was not under arrest, was not being detained, and could end the conversation at any time.  Martinez said he understood.  Detective Nunez nevertheless read Martinez his *Miranda*[3] rights in Spanish:

| | |
|---|---|
| "[Detective Nunez]: | [Y]ou have the right not to say anything, you do understand? |
| "[Martinez]: | Okay, uh-huh. |
| "[Detective Nunez]: | Do you understand? |
| "[Martinez]: | Yes. |
| "[Detective Nunez]: | Okay.  Anything you say can be used in a court of law, do you understand? |
| "[Martinez]: | Yes. |
| "[Detective Nunez]: | Eh, you have the right to have an attorney present before and during any interrogation.  Do you understand? |
| "[Martinez]: | Uh-hum. |

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

|                      |                                                                                                                                   |
|----------------------|-----------------------------------------------------------------------------------------------------------------------------------|
| "[Detective Nunez]:  | If you cannot pay an attorney, one will be appointed to you for free to represent you before and during the interrogation.          |
| "[Martinez]:         | Okay.                                                                                                                              |
| "[Detective Nunez]:  | Do you understand?  You do understand what I told you?                                                                             |
| "[Martinez]:         | Yes, yes."                                                                                                                         |

A few minutes later, Detective Quiroz interrupted the interview and told Detective Nunez that D.M. wanted to speak to Martinez privately.  Martinez agreed to do so.  Detective Nunez told Martinez that the two of them could continue talking after Martinez spoke with D.M.

Martinez and D.M. spoke in a conference room at the police station.  Martinez said there was a microphone recording them. D.M. said that the police "already knew everything" about the two of them.  A report had been filed.  Martinez asked about the report and said, "They know everything then, what is gonna happen is gonna happen and that's it. . . . [I]f they already have evidence[,] they are going to arrest me right now and that's it."

Martinez then returned to the interview with Detective Nunez.  About a half-hour had passed.  Detective Nunez asked Martinez if he had had sex with D.M.  Martinez said that nothing had happened, "[b]ut . . . if you have the evidence, please." Detective Nunez said that they had the evidence and had heard Martinez's conversation with D.M.  Martinez then said, "[I]t's something that . . . I . . . can't explain. . . . I don't know what to

5

do. . . . All by myself I think that this is not . . . right[, but] nonetheless I ended up falling into . . . the same thing."

Martinez said that "nothing ever happened" at the first house he shared with D.M., when D.M. was 10 and 11 years old. Detective Nunez asked when their sexual relationship began. Martinez replied, "I don't have a date," but it was when D.M. was about to turn 13, "[a]round May." "We began like playing around" and "one day it . . . got out of control." D.M. grabbed Martinez's penis and Martinez started touching D.M.'s vagina. Penetrative sex began later.

Martinez confirmed that he and D.M. had sex multiple times: "Yes, yes, yes there were more times . . . ." "I . . . can't give you an exact number," but "[l]et's say about ten times." Martinez said that D.M. never said "no" and never resisted him. The last time the two had had sex was the Sunday before the interview.

Detective Nunez asked Martinez whether he digitally penetrated D.M.'s vagina. Martinez said that he initially put his finger only by D.M.'s clitoris. Later, however, "once everything got out of [control]," Martinez put his finger between the lips of D.M.'s vagina. He did so about five times, including the previous Sunday.

Detective Nunez also asked about oral sex. Martinez said D.M. performed oral sex on him when D.M. was about 14 years old and as recently as three weeks before the interview. Martinez also performed oral sex on D.M. about four times when D.M. was 14 years old.

### 2. Analysis

#### a. The first interview with Detective Nunez

Martinez claims the trial court erroneously admitted his first interview with Detective Nunez because: (1) he was in

custody, and (2) the *Miranda* warnings were defective. We disagree.

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of [their] freedom of action in any significant way.'" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) "Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " ' " (*Ibid.*) This presents "a mixed question of law and fact," requiring us to " 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and . . . independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*Ibid.*)

Circumstances to consider when determining whether a person was in custody during an interrogation include whether they were under arrest, the length of the detention, the location of the detention, " 'the ratio of officers to suspects,' " and " 'the demeanor of the officer, including the nature of the questioning.' " (*People v. Davidson* (2013) 221 Cal.App.4th 966, 972.) Other circumstances to consider include whether police told the person they were "considered a witness or suspect," "whether there were restrictions on the [person's] freedom of movement," whether the police officer's tone was aggressive or accusatory, and whether police otherwise pressured the person. (*Ibid.*)

We conclude Martinez was not in custody during his first interview with Detective Nunez based on the totality of the circumstances. Martinez voluntarily went to the police station.

He was not under arrest during that interview, had not been told that he was a suspect, and was not handcuffed or restrained in any way. The interview lasted just 10 or 15 minutes. It occurred in an unlocked room and Detective Nunez was the only police officer present. The detective was friendly and told Martinez that he did not need to answer any questions and could end the interview at any time. Because a reasonable person in his position would have felt free to do so, Martinez was not in custody. (See, e.g., *People v. Potter* (2021) 66 Cal.App.5th 528, 541-542 [person not in custody where he voluntarily went to police station, was told he did not have to talk to police and could end interview at any time, and was not restrained, and interview lasted under two hours].)

We also reject Martinez's claim that his *Miranda* waiver was invalid because Detective Nunez's warnings were defective. " 'To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation.' " (*People v. Suarez* (2020) 10 Cal.5th 116, 160 (*Suarez*).) A waiver is knowing and intelligent if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) Factors to consider include " 'the defendant's mental capacity,' " whether they signed a written waiver, whether they were advised in their native language, whether they appeared to understand their rights, whether their rights were explained individually, and whether they had " 'prior experience with the criminal justice system.' " (*Suarez*, at p. 160.)

Here, there is no indication that Martinez's mental capacity

8

was impaired when he spoke with Detective Nunez. The detective advised him of each *Miranda* right individually, in his native Spanish. And though he did not sign a written waiver and had no prior experience with the criminal justice system, Martinez repeatedly said he understood his rights. That weighs in favor of a knowing and intelligent waiver.

Martinez counters that Detective Nunez told him that "anything you say can be used in a court of law" instead of "anything you say can be used *against you* in a court of law," which negates any finding of a knowing and intelligent waiver. (Italics added.) But the Supreme Court "has 'never insisted that *Miranda* warnings be given in the exact form described in that decision.' " (*Suarez, supra,* 10 Cal.5th at p. 159.) "Rather, 'the inquiry is simply whether the warnings reasonably "convey to a suspect [their] rights as required by *Miranda.*" ' " (*Ibid.,* alterations omitted.) Detective Nunez's warnings did just that. The trial court properly admitted into evidence Martinez's statements to Detective Nunez during the first interview.

### b. Statements to D.M.

Martinez next asserts he should have received a *Miranda* warning before speaking with D.M. We again disagree.

"*Miranda* protects the Fifth Amendment rights of a suspect faced with the coercive combination of custodial status and an interrogation the suspect understands as official." (*People v. Tate* (2010) 49 Cal.4th 635, 685, italics omitted.) "Implicit in the definition of 'interrogation' is that (1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect *is aware* that [they are] talking to the police or one of their agents." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 813.) "Conversely, there is no 'interrogation' when a suspect speaks with someone [they do] not

know is an agent of the police." (*Id.* at p. 814.) In such a situation, no *Miranda* warnings are required. (*Ibid.*)

Here, nothing in the record indicates that Martinez knew D.M. was working with police when the two spoke alone at the police station. The only evidence Martinez relies on is that he told D.M. police were recording their conversation. But that Martinez believed he was being recorded does not show that he believed D.M. was working as a police agent. (See, e.g., *People v. Wojtkowski* (1985) 167 Cal.App.3d 1077, 1079-1081 [despite believing phone calls were being recorded, defendant's statements admissible because he did not know wife was working with police].) The trial court properly admitted the statements Martinez made to D.M.

### c. The second interview with Detective Nunez

Finally, Martinez claims the trial court erroneously admitted the statements he made to Detective Nunez during the second interview because he did not receive another *Miranda* warning.[4] We disagree once more.

" 'Where a subsequent interrogation is " 'reasonably contemporaneous' " with the prior waiver, and the prior waiver was "knowing and intelligent," police need not undertake a *Miranda* readvisement.' " (*Suarez, supra,* 10 Cal.5th at p. 161.) " 'In determining whether a subsequent interrogation [was] reasonably contemporaneous, we consider the totality of the circumstances.' " (*Ibid.*) Circumstances to consider include " ' "the amount of time that has passed since the initial

---

[4] Martinez also claims he was in custody during this interview. Given our conclusion that Martinez received the proper *Miranda* warnings (see pp. 8-9, *ante,* & p. 11, *post*), we need not resolve this claim.

waiver,' ' " whether the identity of the interrogator or location of the interrogation changed, whether the suspect was reminded of their previous advisement, and whether they have prior experience with law enforcement.  (*Ibid*.)  Other " ' "indicia that the [suspect] subjectively understands and waives [their] rights" ' " should also be considered.  (*Ibid*.)

Based on the totality of the circumstances here, we conclude Martinez's two interviews with Detective Nunez were reasonably contemporaneous such that a second *Miranda* advisement was not required.  Only about 30 minutes passed between the two interviews.  The interviews were with the same police officer and in the same location.  And during the first interview Martinez indicated that he understood and waived his *Miranda* rights.  In our view, readvisement was unnecessary under these circumstances.  (See, e.g., *People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 19 [interrogation taking place up to 40 hours after *Miranda* warning does not require readvisement when conducted by same officers in same location]; *People v. Spencer* (2018) 5 Cal.5th 642, 668-669.)  Martinez's statements to Detective Nunez during the second interview were properly admitted into evidence.

### *CSAAS evidence*

Martinez next contends the judgment should be reversed because the testimony on CSAAS was irrelevant and unduly prejudicial.  We reject these contentions.

### *1.  Background*

At trial, Martinez moved to exclude evidence on CSAAS. He argued CSAAS evidence was unnecessary, unreliable, and unduly prejudicial.  The trial court disagreed and admitted the evidence.

Prosecutors' CSAAS expert, Dr. Anthony Urquiza, testified that the behaviors and symptoms of child abuse victims can be counterintuitive, and that such victims share common characteristics. First, most child victims delay disclosing abuse, even if asked. Such delay may be due to threats or coercion, fear of negative consequences, or the victim's feelings of shame. Second, many abuse victims do not hate their abuser, are not angry with them, and do not avoid them. Third, victims do not often take actions that would lead others to see that they were abused. Instead, they often suppress their feelings so they can cope. Finally, victims often do not clearly and articulately disclose their abuse. If a child has been sexually abused many times, for example, it may be difficult for them to describe every instance of abuse or provide specific details such as dates and the total number of instances of abuse.

Dr. Urquiza said that since most perpetrators of child sexual abuse are older and bigger than their victims, are in positions of authority, or have ongoing contact with their victims, child victims usually submit instead of resisting their abusers. They also often keep the sexual abuse a secret.

Dr. Urquiza also said CSAAS evidence cannot show whether someone is telling the truth or whether they have been abused. He did not review any documents related to Martinez's case and was not provided with any police reports or transcripts of the detectives' interviews with Martinez or D.M. Dr. Urquiza did not even know D.M.'s name.

After Dr. Urquiza's testimony, Martinez requested the trial court instruct jurors pursuant to CALCRIM No. 1193. The court did so: "You have heard testimony from Dr. Anthony Urquiza. [¶] [Dr. Urquiza's] testimony is not evidence that [Martinez]

committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [D.M.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his testimony."

## 2. *Analysis*

Expert testimony on CSAAS is inadmissible to prove that a child has been sexually abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) But it is admissible to rehabilitate the child's credibility where the defendant suggests that their conduct is inconsistent with their claims of abuse. (*Ibid.*) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.) We review the admission of CSAAS testimony for abuse of discretion. (*People v. Brown* (2014) 59 Cal.4th 86, 101.)

Martinez first claims Dr. Urquiza's CSAAS testimony was irrelevant. But during trial Martinez attacked D.M.'s credibility, suggesting that someone should have been able to corroborate his accusations and that he could have been having sex with people other than Martinez. Martinez also argued that D.M.'s testimony was "all over the map," that D.M. did not have a consistent narrative or timeline of the alleged abuse, and that D.M. had "a very strong motivation to lie." Such credibility attacks render CSAAS evidence relevant. (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.)

Next, Martinez claims Dr. Urquiza's CSAAS testimony should not have been admitted because it was used to show that D.M. was telling the truth about his abuse allegations, something

13

CALCRIM No. 1193 reinforced.  But Dr. Uquiza said that CSAAS evidence could not be used to tell whether a person had been sexually abused or whether they were telling the truth about their abuse allegations.  He instead explained why a victim's allegations are not incredible simply because they were kept secret for some time.  Because Martinez attacked D.M.'s credibility, Dr. Urquiza's testimony was properly admitted. (*McAlpin, supra*, 53 Cal.3d at p. 1301; see also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 [CSAAS evidence admissible if "the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation"].)  There was no abuse of discretion here.

We also reject Martinez's claim that CALCRIM No. 1193 created a "a reasonable likelihood that . . . jurors would use CSAAS evidence to determine if [D.M.'s] allegations were true." The instruction was given at Martinez's behest.  The doctrine of invited error thus bars his challenge.  (*People v. Lucero* (2000) 23 Cal.4th 692, 723-724.)

Our division has previously rejected similar arguments against CALCRIM No. 1193.  (*People v. Munch* (2020) 52 Cal.App.5th 464, 473-474 (*Munch*) [rejecting similar argument].) And its use here was proper.  It told jurors that Dr. Urquiza's testimony was "not evidence that [Martinez] committed any of the crimes charged against him" and could instead be considered *only* in evaluating D.M.'s credibility.  Moreover, the trial court instructed jurors that they "alone must judge the credibility or believability of the witnesses" and that they could "disregard any [expert] opinion that [they found] unbelievable, unreasonable, or unsupported by the evidence."  (See CALCRIM Nos. 105, 332.) We presume the jury understood and followed these instructions.

14

(*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 73, 107.)

Martinez next challenges CSAAS evidence as unreliable. To support his challenge, Martinez relies on out-of-state cases that have criticized CSAAS evidence (see, e.g., *Gersten v. Senkowski* (2d Cir. 2005) 426 F.3d 588; *State v. Stribley* (Iowa 1995) 532 N.W.2d 170), severely restricted its use (see, e.g., *State v. J.L.G.* (N.J. 2018) 190 A.3d 442; *Hadden v. State* (Fla. 1997) 690 So.2d 573; *Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830), or banned it altogether (see, e.g., *Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.3d 610; *State v. Foret* (La. 1993) 628 So.2d 1116; *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557; *State v. Davis* (Ohio Ct.App. 1989) 581 N.E.2d 604). "Obviously, we are not bound by these sister-state cases." (*People v. Ross* (2008) 162 Cal.App.4th 1184, 1190.) And we will not follow them if doing so is " 'contrary to good policy.' " (*Ibid.*)

Like other California courts, we believe CSAAS evidence is important to disabuse jurors of misconceptions they may hold about a victim's reactions to sexual abuse. (See, e.g., *People v. Brown* (2004) 33 Cal.4th 892, 906; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503; *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Perez* (2010) 182 Cal.App.4th 231, 244-245.) And we are not alone: The courts of at least 40 other states admit such evidence for similar or even broader purposes. (See *King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 534-535 (dis. opn. of Abramson, J.) [compiling cases].) It would be contrary to good policy to adopt the views on CSAAS evidence expressed in the cases Martinez cites. We therefore decline to do so.

Finally, Martinez claims the trial court should not have admitted CSAAS evidence because it does not meet the

*Kelly*/*Frye*[5] standards of reliability.  We previously rejected such a claim (*Munch, supra*, 52 Cal.App.5th at pp. 472-473), and do so again here.

*The sentence on count 4*

Count 4 of the information charged Martinez with committing incest between January 3 and September 24, 2020. Count 5 charged him with having unlawful sexual intercourse with D.M. between January 3 and September 19, 2020, while count 9 charged him with committing that crime between September 20 and 24, 2020.  After the jury convicted him of all three counts, the trial court imposed consecutive sentences, finding that "the crimes and their objectives were predominantly independent of each other."  Martinez now challenges the imposition of consecutive sentences, contending the sentence on count 4 should be stayed pursuant to section 654 because the conduct underlying his conviction on that count has been punished by the sentences on counts 5 and 9.

Section 654, subdivision (a), provides that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  Pursuant to this provision, a "course of conduct that constitutes an *indivisible* transaction violating more than a single statute cannot be subjected to multiple punishment." (*People v. Martin* (2005) 133 Cal.App.4th 776, 781, italics added.)  But " 'a course of conduct *divisible* in time' "—e.g., a course of conduct that includes sexual offenses committed on separate occasions—" 'may give rise to multiple

---

[5] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir 1923) 293 F. 1013.

16

violations and punishment.' " (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 53, italics added.)  We review the applicability of section 654 for substantial evidence.  (*Jacobo*, at p. 53.)

Substantial evidence supports the trial court's finding that Martinez committed incest on a separate occasion from when he had unlawful sexual intercourse with D.M.  D.M. testified that Martinez had put his penis in D.M.'s vagina three days before Martinez was interviewed by police.  That act was the basis for the unlawful sexual intercourse charged in count 9.  D.M. also said that Martinez put his penis in D.M.'s vagina multiple times in the 10 months leading up to his police interview.  Martinez confirmed this in his interview with Detective Nunez.  This provides substantial evidence to support the trial court's determination that the incest charged in count 4 and the unlawful sexual intercourse charged in count 5 occurred on separate occasions.  The court thus correctly concluded that section 654 is inapplicable.  (See, e.g., *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1309 [consecutive sentences permitted when sex offenses committed on different occasions].)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.

We concur:


GILBERT, P. J.          YEGAN, J.

17

Anthony J. Sabo, Judge

Superior Court County of Ventura

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.